**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERCOLE MIRARCHI,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SENECA SPECIALTY** | : | |
| **INSURANCE COMPANY,** | : | |
| **Defendant.** | : | **No. 10-3617** |

<u>**MEMORANDUM**</u>

PRATTER, J.                                                                      MARCH 22, 2013

Plaintiff Ercole Mirarchi brings this lawsuit after a fire destroyed much of a business

property he owned in Philadelphia.  He charges his insurer Seneca Specialty Insurance Company

("Seneca") with bad faith in the handling of his claim.  After extensive briefing, including

several opportunities for both sides to supplement their initial summary judgment papers, and

multiple oral arguments on the matter, this Court now turns to the cross motions for summary

judgment.  The Court will grant Seneca's motion and deny Mr. Mirarchi's cross motion.

**FACTUAL AND PROCEDURAL HISTORY**[1]

A.      The Policy

This case concerns an insurance policy purchased by Ercole Mirarchi for his restaurant,

Original George's Pizza House.  On July 31, 2007, Mr. Mirarchi bought property located at 2835

---

[1]      In Mr. Mirarchi's Supplemental Opposition to Defendant's Motion for Summary Judgment and
Supplemental Response to Defendant's Statement of Facts, he repeatedly cites to his own affidavit in
support of various facts.  However, his affidavit merely says that whatever is written is true, and the facts
for which the affidavit is cited in support are often statements of third parties (*i.e.*, hearsay) or facts
outside of Mr. Mirarchi's personal knowledge, such as speculations as to the mental state of other parties
or as to their actions during events for which Mr. Mirarchi was not present.  To the extent that Mr.
Mirarchi's only support for various factual contentions is this affidavit, the Court will accept only those
facts that do not fall into one of the two aforementioned categories.  Furthermore, Mr. Mirarchi's
Statement of Facts in his Supplemental Opposition is riddled with unsupported facts and inferences.
Although the Court is mindful of its obligation to draw inferences in favor of the non-moving party, the
Court need not accept inferences that are not properly supported by record evidence, let alone
unsupported facts.

and 2837 W. Girard Avenue, Philadelphia, PA, consisting of a first-floor restaurant (then in operation) and apartments on the second and third floors (then vacant).  The property was covered by Defendant Seneca's commercial property insurance policy.  The policy limit for building coverage was $600,000, and the valuation method was listed as actual cash value ("ACV"), including a Pennsylvania endorsement which specified that

> Actual Cash Value is calculated as the amount it would cost to repair or replace Covered Property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence.  Actual cash value applies to valuation of Covered Property regardless of whether that property has sustained partial or total loss or damage.  The Actual Cash Value of the lost or damaged property may be significantly less than its replacement cost.

Pl.'s Ex. C, Form SSI 305.

The policy does not provide for the payment of any funds without a formal proof of loss and does not guarantee or otherwise provide for partial payments.  *See id.* at Form CP 00 10 04 02, p. 9-10.  The policy specifies that if the insurer and insured disagree on the value of the property or amount of loss, either party can make a written demand for an appraisal.  *Id.*  The policy also requires the policy holder to take reasonable steps to ensure that damaged property is properly protected from further damage by the elements.

Mr. Mirarchi had a mortgage on the property with National Penn Bank, and that bank was listed on the insurance policy as the mortgagee.  Within a week of Mr. Mirarchi's purchase, Seneca obtained a Commercial Building Valuation Report from Marshall & Swift/Boeckh on August 7, 2007, which estimated a $501,171 replacement cost and $175,410 ACV for the building.[2]  Seneca's risk evaluation worksheet for the property showed an actual cash value (ACV) of $429,799 for the building, despite the $600,000 policy limit.

---

[2]     Mr. Mirarchi calls this valuation report "hearsay."  He cites in his supplement a portion of a deposition of a Seneca underwriter, Gabriel Abbinanti, who stated that he did not know how Marshall & Swift/Boeckh had arrived at the $175,410 figure.  Mr. Mirarchi did not, however,

B.    The Fire

On May 8, 2008, the property was damaged by fire, and notice of the fire was provided to Seneca promptly thereafter.  No one argues that the fire was not a covered event, but Mr. Mirarchi claims that Seneca unreasonably delayed the adjusting and payment process in bad faith which caused him financial damage.  The undisputed facts do not support such a claim.  By May 12, Seneca had retained John McHenry, an independent adjuster with 30 years of experience, to inspect the site.  Seneca also retained Cubit Construction and Appraisal to inspect the loss and provide a repair estimate.  Cubit has worked extensively with insurance companies over the years – Mr. McHenry had used Cubit about ten times a month over the course of about ten years, and 15 to 20 other insurance companies in the Philadelphia area have used Cubit to restore fire-damaged property.  Mr. Mirarchi hired Young Adjustment to represent him with respect to the fire loss.

On May 16, 2008, Mr. McHenry contacted Young Adjustment to request information relating to his investigation.  He contacted Young again on June 17, 2008 and July 1, 2008, and he finally received all of the requested information on July 22, 2008.[3]  On July 22, 2008, Young provided Mr. McHenry with its building repair estimate of $988,800 replacement cost, which Young depreciated to $692,160 ACV.  By that time Cubit had provided to Mr. McHenry an estimate of $409,968.06 for replacement costs, plus $3,234 for "board up services," totaling

---

explain how Mr. Abbinanti's lack of knowledge regarding a third party's work product made the report hearsay.  While for some purposes the document may represent hearsay, for others – such as the fact that a written valuation report setting specific costs or values actually exists – it is not hearsay.  The document's role in the resolution of these cross motions plays out below.

[3]      A few days before that, on July 17, 2008, Young provided Mr. McHenry with a statement from National Penn showing Mr. Mirarchi's principal loan balance as $329,947.37.

$413,202.06.  Mr. McHenry reduced that figure to $331,777.42 ACV after accounting for depreciation.[4]

C.      Proofs of Loss

Although by August 2008, inspections of the property had long been carried out and estimates provided by both sides, Mr. Mirarchi did not provide a formal proof of loss until August 4, 2008.  That partial proof of loss requested $100,000, and Seneca mailed a check for that amount on September 24, 2008.[5]  On October 6, 2008, Young submitted two partial proofs of loss with Mr. Mirarchi's signature for: (1) $649,747.58 ACV for the loss, or a partial payment of $331,777.42 for the undisputed amount, less the $100,000 already advanced; and (2) $42,000 ACV for personal property.  On October 29, 2008, Seneca paid the $25,000 policy limits for the personal property claim, and on November 11, 2008, paid $230,439 for the remainder of the undisputed amount (minus Mr. Mirarchi's deductible).  In December 2008, Mr. Mirarchi submitted a business interruption claim for the period May 9, 2008 through May 9, 2009, which Seneca paid on May 4, 2009.  Mr. Mirarchi submitted no other proofs of loss, and at no time during the appraisal process did he submit a supplemental demand for a further advance on "undisputed" amounts.

D.      Amicable Efforts

After exchanging disparate estimates, Young and Mr. McHenry continued to discuss the claim.  Between August 7, 2008 and the end of September, 2008, McHenry and Young met, corresponded, and spoke on the phone about the fire loss.  Mr. McHenry performed an extensive

---

[4]      Mr. McHenry applied a 35% depreciation factor, and Young applied a 30% factor.

[5]      Mr. Mirarchi had requested that amount months earlier; however, there is no evidence that he had also submitted a proof of loss months earlier.  Likewise, Mr. Mirarchi submitted requests for other damages, such as personal property loss, prior to submitting proofs of loss for the amounts of those claims.  Seneca does not and did not pay requests were not paid until after proofs of loss are submitted.

comparison between Cubit's estimate and Young's estimate and concluded that Cubit's estimate was a good estimate, even in light of Young's much higher number.  On September 18, 2008, Mr. McHenry provided Young with a notebook with his analysis.  According to Mr. McHenry, Mr. Mirarchi specifically told Young that he would not accept less than $500,000 for the loss.  According to Mr. Mirarchi, Seneca never authorized Mr. McHenry to offer more than $331,777.42 to settle the claim.

E.      The Appraisal Process

Despite allegations in the First Amended Complaint that Seneca forced Mr. McHenry to enter appraisal proceedings to delay Mr. Mirarchi's reconstruction, it appears that Young, on behalf of Mr. Mirarchi, actually requested to enter the appraisal process in a letter dated September 19, 2008.[6]  Mr. McHenry did at one point say to Young that if an agreement could not be reached, the appraisal process would be in everyone's best interest, and he testified at his deposition that the decision was mutual.

Shortly after September 19, 2008, both sides appointed an appraiser – Mr. Mirarchi appointed Mark Conti, and Seneca appointed Dennis Langford.  In addition to construction costs, the amount of depreciation by which the parties' respective estimates should be reduced was submitted to the umpire for decision.

Mr. Langford submitted a preliminary report on January 9, 2009, in which he estimated the replacement cost (not ACV) for the loss at $527,372.29.  Mr. McHenry emailed Mr. Langford comments on the report on January 12, 2009, disagreeing with some of Mr. Langford's estimates.  On January 28, 2009, Mr. Langford updated his appraisal, providing an estimate of

---

[6]      David Horowitz of Young also confirmed this at his deposition.  Mr. Mirarchi now points to some time entries that show that Mr. McHenry recommended the appraisal process to Seneca in early September, but that does not in itself demonstrate that Seneca took him up on the recommendation at that time.

$561,768.94 for replacement cost.  He also pointed out to Mr. McHenry various omissions in and disagreements with Cubit's estimate.

On March 18, 2009, Mr. Langford gave Mr. Conti his appraisal report; in the report, he set the ACV at around $450,000 (construction cost was estimated at $562,985; architect's fees brought the total to $599,570.28).  Mr. Conti did not respond to Mr. Langford's report until July 1, 2009.  During the time between when Mr. Langford sent the report to Mr. Conti and when Mr. Conti responded, Mr. McHenry told Young that Mr. Conti was not fully cooperating.  On July 6, 2009, Greg Crapanzano, a Seneca employee, emailed Seneca's CFO Mel Funk, referenced the differences between the four estimates (two appraisers and two adjustors) and noted that he thought "this will go to the umpire and they will split the difference between the PA's new claim and Langford's adjustment and end up north of our policy limit."

On August 26, 2009, the two appraisers met with the umpire at the loss site.  On September 15, 2009, Mr. Conti emailed the umpire and Mr. Langford to ask that the umpire delay his final award until newly discovered structural problems were investigated.  On October 6, 2009, Mr. Conti submitted an engineering report.  Based on this, Mr. Mirarchi submitted a supplemental claim for structural damages.  On October 20, 2009, the umpire awarded $618,338.07 ACV for the building damage and $6,000 ACV for the additional structural damage.  Consequently, on November 6, 2009, Seneca issued a check in the amount of $268,222.58 for the balance of the policy limits (*i.e.*, limits less the previous advances).

F.      City Taxes

A Philadelphia ordinance, Phila. Code § 9-1900 *et seq*., requires insurers of fire-damaged property to request information about tax delinquencies on the property and to satisfy any delinquencies before making a loss payment to the insured.  When Mr. McHenry inquired about

taxes owed on the property, the City told him that Mr. Mirarchi was about $1,300 delinquent. He told Young, who told him that the matter had been resolved.  According to Seneca, Young failed to present Mr. McHenry or Seneca with proof that the delinquent taxes had been cleared, despite their requests.  According to Mr. Mirarchi, he presented a tax receipt and cancelled check to Seneca.  Seneca then issued a check for the tax delinquency; the check did not clear because Seneca improperly issued it in the names of multiple parties rather than the City only as required by the ordinance.  In the spring of 2009, Young corresponded with Mr. McHenry regarding the status of the tax check on more than one occasion.  According to Seneca's claims log, the error was discovered on June 24, 2009, and on June 29, 2009, the check was reissued with only the City of Philadelphia listed as the payee.

  G.  The Lawsuit

  Mr. Mirarchi filed suit against Seneca on June 16, 2010 in Pennsylvania state court, seeking damages for bad faith, breach of contract, and violations of Pennsylvania's Unfair Insurance Practices Act.  Seneca promptly removed the action to this Court, based on diversity of citizenship.  Seneca then filed a motion for summary judgment in the fall of 2011, to which Mr. Mirarchi responded with an opposition and cross motion for summary judgment.  Later, Mr. Mirarchi moved for further discovery, and his request was granted in part and denied in part. The motions then were supplemented based on this new discovery.  Shortly before oral argument could be held on the pending motions, Mr. Mirarchi's counsel moved to withdraw.  After Mr. Mirarchi found replacement counsel, the Court allowed new counsel to further supplement the record and briefing in this matter, and another oral argument on the motions ensued.

LEGAL STANDARD

Upon motion of a party, summary judgment in a federal case is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . .  admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a), (c); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record."  Fed R. Civ. P. 56(c)(1).  "The Court need consider only the cited materials" when determining whether there exists a genuine issue of material fact for trial.  Fed R. Civ. P. 56(c)(3).  If the cited evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

DISCUSSION

The parties have filed cross motions for summary judgment.  Seneca seeks summary judgment on all of Mr. Mirarchi's claims.  Mr. Mirarchi's "cross motion" does not make clear on which claims he seeks summary judgment.  At oral argument, after all supplemental briefing had been filed, counsel for Mr. Mirarchi clarified that he sought summary judgment on his breach of contract claim, but not on his bad faith claim.  The Court will first turn to issues raised in Seneca's motion regarding Plaintiff's expert and will then address each of Mr. Mirarchi's claims.[7]

A.     Plaintiff's expert

Plaintiff submitted the expert report of Allan Windt in support of his claim that Seneca acted in bad faith.  Seneca, in its motion for summary judgment, argues that Mr. Windt's report is inadmissible.  Given that Mr. Windt is an attorney with experience handling insurance coverage claims but with no professional insurance experience as an adjustor, appraiser, umpire or other direct industry involvement, Seneca argues that Mr. Windt's report "consists solely of inadmissible legal opinions about insurance law and whether Seneca's conduct amounts to bad faith."  Def.'s MSJ at 23.  Mr. Windt's report does indeed consist primarily of legal argument, continually citing to both his own treatise on insurance law and bad faith and to case law in Pennsylvania and elsewhere to opine that Seneca acted in bad faith – in fact, Plaintiff's brief in opposition/cross-motion largely reiterates Mr. Windt's legal arguments.  Therefore, Seneca contends that Mr. Windt's report goes to the ultimate legal issue in the matter, something on which an expert is not permitted to opine.

---

[7]     Seneca moves for summary judgment on Mr. Mirarchi's Unfair Insurance Practices Act claim; Mr. Mirarchi concedes that he does not have a private right of action under that Act, but that violations of the Act may be used as evidence of bad faith under certain circumstances.  To the extent that his Complaint attempts to state a freestanding claim under the Act, the Court will grant Seneca's Motion as to this claim as unopposed.

In *Allstate Prop. & Cas. Ins. Co. v. Vargas*, Civil Action No. 06-3368, 2008 WL 4104542 (E.D. Pa. Aug. 29, 2008), the defendant proffered the reports of two experts in support of her insurance bad faith counterclaim, one of whom was a lawyer. The lawyer's report, which the defendant offered to prove that the plaintiff's conduct delayed resolution of the settlement of the claim in bad faith, consisted of a series of legal opinions on Pennsylvania insurance law. *Id.* at *5. The court found that the expert's testimony on issues of law, coupled with a lack of factual support for conclusions such as that the insurer's conduct created *unnecessary* delays, made the lawyer-expert's opinion inadmissible. Likewise, the expert report of defendant's non-lawyer expert, who concluded that the plaintiff acted in bad faith based on the facts of the case, was also excluded to the extent the expert testified as to the ultimate legal issue of whether the facts presented constituted bad faith. *Id.* at *6. *See also Dattilo v. State Farm Ins. Co.,* No. Civ. A. 97-1842, 1997 WL 644076, at *5 (E.D. Pa. Oct. 17, 1997) ("Bad faith is a legal concept of general application which does not require that scientific, technical or specialized knowledge be presented to assist the trier of fact.").

Mr. Mirarchi includes in his briefing a footnote that says that the report is not about the ultimate legal issues in the case but rather about whether Seneca was reasonable in believing that law supported its position, *i.e.*, whether a legal dispute actually existed. He cites his expert's own treatise theorizing on the admissibility of legal expert testimony in bad faith cases in support, as well as case law. *See McCrink v. Peoples Benefit Life Ins. Co.*, No. 2:04-CV-01068, 2005 WL 730688, at *3-5 (E.D. Pa. Mar. 29, 2005); *Gallatin Fuels v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 420-23 (W.D. Pa. 2006). Both of the cited cases from within this Circuit excluded portions of the expert reports that dealt with issues of contract construction. *See McCrink*, 2005 WL 730688, at *4; *Gallatin Fuels*, 410 F. Supp. 2d at 421. However, both cases

also allowed the expert's analysis of facts that the expert believed showed that the defendant

deviated from industry standards, provided that the expert would not offer an opinion on the

ultimate issue in the case – *i.e.*, whether or not the defendant acted in bad faith – or on more

subjective issues, like the defendant's state of mind.  *See McCrink*, 2005 WL 730688, at *4-5;

*Gallatin Fuels*, 410 F. Supp. 2d at 421-23.

However, the *McCrink* case does not fully describe what expert testimony was proffered

in that case and notes that the exceptional cases allowing expert testimony in bad faith cases are

those in which there are "complex or highly technical insurance issues."  *See McCrink*, 2005 WL

730688, at *4-5.  And in *Gallatin*, the expert had actual insurance industry experience on which

to base his opinions that the defendant deviated from industry standards.  *Gallatin Fuels*, 410 F.

Supp. 2d at 420.  In this case, Mr. Windt's report does contain a good deal of contract

interpretation, and is written by someone arguably with expertise in insurance law, but not in

actual claims handling or adjusting.  Indeed, the report is seasoned throughout with legal

conclusions based on Mr. Windt's insurance treatise (which is, in turn, based on case law from

many jurisdictions outside of Pennsylvania).  In short, the bulk of the expert report would not be

admissible, and Mr. Mirarchi may not rely on Mr. Windt's report to the extent that it instrudes

upon the province of the Court and the jury because it contains long passages of legal arguments

and contract construction and does not deal with complex coverage issues that would arguably

assist the fact-finder.

B.      Bad Faith

In Mr. Mirarchi's Amended Complaint, he claims that Seneca acted in bad faith by

refusing to pay undisputed amounts "in a timely manner," failing to reconcile the disparity in

damages estimates, withholding payments based on a false contention that it had sent tax

remittances to the City of Philadelphia, failing to conduct a reasonable investigation, refusing to settle even after liability became clear, and forcing Mr. Mirarchi to go through a lengthy appraisal process just to avoid paying benefits.  In the motion papers before the Court, Mr. Mirarchi also claims that Cubit and Mr. McHenry conspired with Seneca to set their damage estimates at a preordained level.

Pennsylvania courts define "bad faith" under 42 Pa. C.S. § 8371 as "any frivolous or unfounded refusal to pay proceeds of a policy."  *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. 1994).  A plaintiff must prove by clear and convincing evidence that an insurer had no reasonable basis for its response to the claim and knew or recklessly disregarded the lack of reasonable basis in denying a claim. *Vargas*, 2008 WL 4104542, at *4.  The plaintiff's burden, therefore, is "commensurately high" in opposing a summary judgment motion "because the court must view the evidence presented in light of the substantive evidentiary burden at trial."  *Northwestern Mutual Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (internal quotation omitted).

Because Mr. Mirarchi did eventually receive the full policy limits of his policy, Seneca argues that the thrust of Mr. Mirarchi's claim is simply that Seneca delayed payment of Mr. Mirarchi's claim.  A plaintiff who argues that a delay in the payment of a claim amounted to bad faith must show that the delay is attributable to the defendant, that the defendant had no reasonable basis for the actions it took resulting in the delay, and that it knew or recklessly disregarded the lack of reasonable basis for the delay.  *See Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 370 (E.D. Pa. 2011).

1.     Bad faith prior to appraisal[8]

With respect to Seneca's actions prior to the appraisal process, Mr. Mirarchi's main contention now seems to be that Cubit and Mr. McHenry were biased and conspired with Seneca to set the loss amount at a predetermined level.  He claims that, with a bit of rounding along the way, if one takes the purchase price of $450,000 and subtracts the basement replacement cost estimated by Cubit, multiplies it by a 71.5% depreciation value (the factor used in a risk evaluation worksheet predating the loss and prepared by a company other than Seneca), and then adds back the basement replacement cost, the result is $334,277.42.  Subtracting the deductible, the net result is $331,777.42, which is Mr. McHenry's ACV estimate.  Mr. Mirarchi also points to the similarity between the bank loan payoff number and Mr. McHenry's ACV estimate.  Hence, "a conspiracy."

Seneca essentially counters that the contortions that Mr. Mirarchi went through to arrive at this "coincidence" speak for themselves, and indeed, other than crunching numbers, Mr. Mirarchi provides no support for his conspiracy theory or even a rational reason that Cubit or Mr. McHenry would go through such contortions to arrive at the supposedly pre-set number.  He cites to no evidence that would reveal any link between the bank figures and Mr. McHenry's estimate or any incentive for Seneca to only pay enough to cover the bank loan.  The only thing approaching a fact that he cites in support of bias on Cubit's part is its history of engagements by insurance companies.

---

[8]     At oral argument on April 9, 2012, Mr. Mirarchi's former counsel stated that his client conceded that he had no bad faith claim as to events prior to when the claim went into the appraisal process.  Mr. Mirarchi's new counsel, however, later argued that Seneca acted in bad faith from the beginning.  The briefing in the case makes it difficult to tell exactly what Mr. Mirarchi believes was bad faith and what was not, as he responds to some arguments made by Seneca and not to others.  In an abundance of caution, the Court will examine all potential bad faith arguments that Mr. Mirarchi discussed anywhere in his briefing or at oral argument, including those that he disclaimed at one oral argument but attempted to revive at another.

Mr. Mirarchi also claims that the reason that Seneca refused to increase its offer during the appraisal process was because Seneca wanted to keep the claim under its risk valuation projections.  He does not cite to the record in support of this, aside from discussing the risk valuation worksheets themselves.  To his most recent supplement, he attached powerpoint presentations that he authored in support of this theory, and that also purport to show other instances of Seneca manipulating numbers in ways that he claims demonstrate that they never intended to pay his full claim.  Seneca argues that these documents are not record evidence, have no basis in record evidence, and, at any rate, are unpersuasive, to say the least.

The Court agrees with Seneca.  Mr. Mirarchi has not tied any of his calculations to record evidence that would tend to show any conspiracy or design on Seneca's part to act in bad faith, and does not explain why it would be at all logical to go through such mathematical contortions to arrive at certain preordained figures.  Moreover, to the extent Mr. Mirarchi also relies on loss reserve information and assigns it any significance in the valuation process, the Court has already held that loss reserve information is not relevant evidence of the value of Mr. Mirarchi's loss.  *See* July 22, 2012 Memorandum and Order, Docket Nos. 24, 25.

Moreover, even if Seneca's initial offer was a "low-ball" offer, such offers are not evidence of bad faith.  *See, e.g., Terletsky*, 649 A.2d at 690.  In this case, Seneca relied on experts who spent a considerable amount of time preparing estimates and who later corresponded by email and letter with Mr. Mirarchi's adjustor, spoke on the telephone and met in person to discuss the estimates, and prepared a detailed comparison between the two estimates.  That neither party would budge from its position during negotiations, ultimately leading the parties to enter the appraisal process, is not in and of itself evidence of bad faith.

2.      Delay in partial payments

Mr. Mirarchi's bad faith claim is also based on the delay between when he reported his

claim and when he received partial payments.  Seneca argues that it had no contractual or legal

duty to advance partial payments.  Certainly, nothing in the insurance contract at issue here

mandates partial payments.  Moreover, courts applying Pennsylvania law have held that an

insurance company has no legal duty to make partial or advance payments when the valuation of

the overall claim is still in dispute.  *See Vargas*, 2008 WL 4104542, at *9; *Zappille v. Amex*

*Assurance Co.*, 928 A.2d 251, 256 (Pa. Super. 2007); *Perschau v. USF Ins. Co.*, No. CIV. A. 97-

7801, 1999 WL 162969, at *4 n.6 (E.D. Pa. Mar. 22, 1999).  Seneca also points out that it did, in

fact, pay the undisputed portions of the claim after Mr. Mirarchi submitted proof of loss forms.

Mr. Mirarchi cites to a general treatise on insurance law, which states that when benefits

under a policy are clearly due, they should be paid without delay.  He cites to no Pennsylvania

law on this point.  Mr. Mirarchi also responds that Seneca should not have conditioned payment

of the partial amounts on receipt of a formal proof of loss, citing a provision of the Pennsylvania

Unfair Insurance Practices Act that states that it is an unfair insurance practice to "[d]elay[] the

investigation or payment of claims by requiring the insured, claimant or the physician of either to

submit a preliminary claim report and then requiring the subsequent submission of formal proof

of loss forms, both of which submissions contain substantially the same information."  40 P.S. §

1171.5(a)(10)(XII).  He argues that Seneca had all of the information regarding the loss before

the sworn proof of loss was submitted and therefore that requiring the submission was

unnecessary and frivolously delayed payment.  The cases he cites to support this argument,

however, are from jurisdictions other than Pennsylvania.

The case law on this issue clearly weighs in favor of Seneca.  Seneca had no duty, under the insurance contract or under case law, to make partial payments to Mr. Mirarchi, particularly when the coverage amount was still in dispute.  Whether the payments of undisputed portions of the claim were timely or not, then, does not matter, since Seneca had no duty to pay them in the first place.  Thus, any supposed delays in making partial payments do not support Mr. Mirarchi's bad faith claim.

3.     Bad faith after the receipt of Mr. Langford's estimate

Mr. Mirarchi argues that after Seneca received Mr. Langford's estimate Seneca could no longer in good faith rely on Cubit's estimate, as Mr. Langford's estimate indisputably revealed the flaws with Cubit's estimate.  He then argues that it is bad faith to fail to react to new information that discredits information or information or opinion that the insurer previously relied on.

In support, he cites *Willow Inn v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 233 (3d Cir. 2005), which describes an insurer that "withheld the difference between the lowest pre-appraisal estimate and its advance payment on the unreasonable ground that the appraisal might be returned in an amount less than the lowest estimate."  *Willow Inn*, however, does not support Mr. Mirarchi's argument.  First of all, the case was before the Third Circuit Court of Appeals on review to consider the issue of punitive damages only.  The court's reference to this instance of the insurer's conduct was in the context of a laundry list of conduct showing that the insurer acted deliberately.  There was no specific argument for or against this fact being evidence of bad faith, and the court did not have occasion to hold that an insurer has a duty to advance partial payments when portions of the claim are undisputed.  Moreover, in *Willow Inn*, the only advance that the insurer would give to the insured was an amount less than *any* of the adjustors' various

and varying estimates.  Here, Seneca paid Mr. Mirarchi the full amount of Mr. McHenry and
Cubit's estimated loss.

Seneca counters by reiterating its argument that it had no duty to advance a partial
payment, particularly after the parties had already entered the appraisal process and in the
absence of another proof of loss or request for payment, and that Mr. Mirarchi never made a
demand for the difference between the previous advance and Mr. Langford's estimate.  It cites
*Perschau*, 1999 WL 162969, in which a court in the Eastern District of Pennsylvania applying
Pennsylvania law rejected arguments that a failure to pay undisputed amounts during the
appraisal process was bad faith.  *See id.* at *4, n.5.  Seneca also argues that it was relying on a
good faith interpretation of its own contract, which states that payment resulting from the
appraisal process is not due until 30 days after an appraisal award, and on Pennsylvania case law.

Moreover, Seneca argues that Mr. Langford's estimate did not conclusively establish that
Cubit's estimate was unreasonable.  It cites in support *Albert v. Nationwide Mut. Fire Ins. Co.*,
No. 3CV991953, 2001 WL 34035315 (M.D. Pa. May 22, 2001).  In that case, the court held that
a second, higher estimate did not prove that the first estimate was unreasonable or that the
amount of loss was clear, and that, in any case, the defendant-insurer did not have an obligation
to make advance payments.  *Id.* at *11.  Here, although there were items in Mr. Langford's report
that did not appear in Cubit's, the reverse was also true.  Mr. McHenry had also spent several
hours examining the Cubit report and comparing it to Young's estimate, and he again spent time
reviewing Mr. Langford's report, even engaging in discussions with Mr. Langford about the
estimate.

Once again, the lack of any duty on Seneca's part to make a partial payment while the
appraisal process was ongoing leads this Court to conclude that Seneca's failure does not add up

to bad faith.  This is particularly true in view of Mr. Mirarchi's failure to even request a partial

payment after Mr. Langford's estimate was released and of evidence that Seneca did thoroughly

examine Mr. Langford's estimate.  Thus, Seneca had no obligation to do anything more in light

of Mr. Langford's appraisal, other than to allow the appraisal process to move forward, given

that there clearly was still a dispute as to the proper valuation of the loss even with Mr.

Langford's appraisal.

        4.     Depreciation

      Mr. Mirarchi argues that Seneca's risk documents show that it never intended to pay the

full amount of the policy because the depreciated value of the entire property as stated in

Seneca's risk valuation worksheets was less than the policy limits.  Moreover, he claims that

Seneca's policy, which allows for depreciation of partial fire losses, is contrary to Pennsylvania's

standard fire insurance policy as stated in 40 P.S. § 636.  Therefore, he argues, Seneca acted in

bad faith and breached its contractual obligations by depreciating the losses throughout the

adjustment and appraisal processes.

      Under 40 P.S. § 636, all standard fire policies must include language stating that an

insurer will pay "the extent of the actual cash value of the property . . . , but not exceeding the

amount which it would cost to repair or replace the property with material of like kind and

quality."  Mr. Mirarchi cites cases which state that this language does not allow an insurance

company to deduct depreciation from a partial loss.  Therefore, he argues, Seneca's policy

endorsement specifically allowing for depreciation in partial loss situations is contrary to

Pennsylvania statutory law.  *See State Farm Mut. Auto Ins. Co. v. Foster*, 889 A.2d 78, 82 (Pa.

2005) ("Stipulations in a contract of insurance in conflict with, or repugnant to, statutory

provisions which are applicable to, and consequently form a part of, the contract, must yield to

the statute, and are invalid, since contracts cannot change existing statutory laws.")

 Seneca counters that this is a brand new argument, never put forth in the Amended

Complaint or at any other time and that neither Mr. Mirarchi's adjuster or appraiser ever raised

this issue.  It argues that because the parties' appraisal agreement specifically noted that the

umpire's job was to determine actual cash value as defined by the policy, Mr. Mirarchi cannot

now argue that depreciation was improper.  It cites case law that states that depreciation of

partial losses is appropriate if policy language explicitly provides for it.  *See Kane v. State Farm*

*Fire & Casualty Co.*, 841 A.2d 1038, 1041 (Pa. Super. 2003) (noting that, in holding that partial

losses are not normally subject to depreciation, the Pennsylvania Supreme Court left open the

possibility that an insurer could craft specific language that would avoid this default rule).

 Seneca is correct that there are no Pennsylvania cases stating that an insurer can never

modify the standard fire insurance policy to allow recovery of only replacement cost minus

depreciation in partial loss situations.  *Farber v. Perkiomen Mut. Ins. Co.*, 88 A.2d 667 (Pa.

1952) remains the leading Pennsylvania Supreme Court case on the subject, and that case

expressly left open the possibility of an insurer crafting its own language to modify the standard

policy.  Mr. Mirarchi counters by citing to a dissent in another Pennsylvania Supreme Court

opinion that seems to suggest that a standard fire insurance policy could never be modified to

allow for depreciation of partial losses.  *See London v. Ins. Placement Facility*, 703 A.2d 45 (Pa.

Super. 1997).  What Mr. Mirarchi cites is not binding law.  He is right that *Farber* was not

directly looking at the issue in the context of 40 P.S. § 636, but he ignores the *London* majority

opinion which, albeit in *dicta*, states that even a standard fire policy could be modified by

specific language to allow for the deduction of depreciation in partial loss situations.  *See*

*London*, 703 A.2d at 50.  Moreover, the plain language of 40 P.S. § 636 does not appear to specifically bar a policy modification.  Rather, the statute is silent as to partial loss situations and does not explicitly prohibit the payment of less than replacement cost – it merely sets the upper limits of claims under policies governed by the statute.

For these reasons, then, it was not unreasonable for Seneca to depreciate the actual cash value of the loss, nor was it contrary to Pennsylvania law to include a contract provision limiting partial loss recoveries to actual cash value minus depreciation.

>           5.        Tax remittances

With respect to the withholding of payments due to tax remittances, Seneca explains that it negligently issued a check to multiple parties instead of just to the City of Philadelphia, and that this explains its reissuance of a new check when the error was discovered.  It therefore argues that it did not lie when it told Mr. Mirarchi that it had issued a check to cover a tax delinquency, and that this mere negligence is not actionable as bad faith.

Mr. Mirarchi did not respond to this argument anywhere in his briefing, despite filing multiple memoranda of law in this matter.  He did provide belatedly respond to Seneca's Statement of Facts with some citations to the record that showed that the parties disputed whether Mr. Mirarchi had submitted sufficient evidence for Seneca to conclude that any tax delinquency was cleared and that Mr. Mirarchi's adjustor contacted Mr. McHenry at various points to follow up on whether Seneca had, in fact, submitted a check to the City.  When the Court asked counsel for Mr. Mirarchi at oral argument on July 23, 2012 whether, despite failing to mention this issue in his briefs, he still maintained that this was part of his bad faith claim, he argued that it was.

While it was clear that Seneca made a mistake in submitting the tax check, Mr. Mirarchi has not provided any record evidence that this error, and its eventual correction, were the result of anything other than negligence.  Thus, these facts cannot form the basis of a bad faith claim.

C.      Breach of Contract

Pennsylvania courts have acknowledged that there are distinct causes of action for both breach of good faith and statutory bad faith.  *See Ash v. Continental Ins. Co.*, 932 A.2d 877, 884 (Pa. 2007) (noting that breach of the implied covenant of good faith is a separate cause of action from a statutory bad faith claim and that damages for breach of contract are limited to compensatory damages).  Mr. Mirarchi's contract claim seems to be based on a breach of good faith theory, rather than on a specific policy provision.  More specifically, he argues that Seneca was not entitled under the contract to deduct depreciation and that Seneca did have a duty to advance partial payments.  These arguments, however, have been dealt with above, and the same conclusion is warranted here.

Seneca also argues that "[a]n action for breach of an insurance contract does not lie when the policy proceeds have been paid."  *Oehlmann v. Metropolitan Life Ins. Co.*, 644 F. Supp. 2d 521, 533 (M.D. Pa. 2007).  Here, after the appraisal process, Seneca paid the policy limits on Mr. Mirarchi's claim.  Mr. Mirarchi never directly responds to this argument anywhere in the extensive briefing in this matter.

Therefore, because, as noted above, Seneca *was* entitled to deduct depreciation under the terms of the insurance contract and *was not* obligated to advance partial payments, and because Seneca did pay Mr. Mirarchi the policy limits, Mr. Mirarchi's breach of contract claim must also fail.

**CONCLUSION**

For the foregoing reasons, the Court will grant Seneca's Motion for Summary Judgment in its entirety and deny Mr. Mirarchi's Cross Motion.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE